**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

**Ruth Barrios,**

    *Plaintiff*,

    v.

**Chex Systems, Inc.,**
**Lead Express, Inc.,** *and*
**Takehisa Naito,**

    *Defendant*s.

Case No. _____

Ad Damnum: **$8,000 plus Fees & Costs**

**JURY TRIAL DEMANDED**

## COMPLAINT & JURY TRIAL DEMAND

COMES NOW the Plaintiff, **Ruth Barrios** ("**Ms. Barrios**"), by and through her attorneys, Seraph Legal, P.A., and complains of the Defendants, **Chex Systems, Inc. ("Chex Systems")**, **Lead Express, Inc.** ("**Lead Express**") and **Takehisa Naito** ("**Naito**") (collectively, "**Defendants**"), stating as follows:

### PRELIMINARY STATEMENT

1. This is an action brought by Ms. Barrios against the Defendants for violations of the *Fair Credit Reporting Act*, 15 U.S.C. § 1681, *et. seq.* ("**FCRA**").

### JURISDICTION AND VENUE

2. Subject matter jurisdiction arises under the FCRA, 15 U.S.C. § 1681p, and 28 U.S.C. § 1331.

3. The Defendants are subject to the provisions of the FCRA and to the jurisdiction of this Court pursuant to 28 U.S.C. § 1331.

4. Venue is proper in the Middle District of Florida, pursuant to 28 U.S.C. §1391(b)(2), because the events giving rise to this cause of action were caused by the Defendants and occurred within this District.

## PARTIES

### Ms. Barrios

5. **Ms. Barrios** is a natural person residing in Brandon, Hillsborough County, Florida, and a *Consumer* as defined by the FCRA, 15 U.S.C. § 1681a(c).

### Lead Express

6. **Lead Express** is a Nevada corporation with a primary business address of **2780 South Jones Blvd., Suite 200-3132, Las Vegas, NV 89146.**

7. The Nevada registered agent for Lead Express is **Business Filings Incorporated, 701 S. Carson St., Suite 200, Carson City, NV 89701.**

### Naito

8. **Naito** is the CEO and manager of Lead Express. **SEE PLAINTIFF'S EXHIBIT A.**

9. Naito currently owns many other interrelated companies, including, but not limited to, Kotobuki Marketing, and is believed to reside at **7430 Yonie Ct., Las Vegas, NV 89117.**

### Chex Systems

10. **Chex Systems** is a Minnesota corporation with a primary business address of **601 Riverside Ave., Jacksonville, FL 32204.**

11. Chex Systems is registered to conduct business in the State of Florida, where its Registered Agent is **CT Corporation System, 1200 South Pine Island Rd., Plantation, FL 33324**.

12. Chex Systems is a nationwide *Consumer Credit Reporting Agency* ("**CRA**") within the meaning of 15 U.S.C. § 1681a(f), in that, for monetary fees, dues, or on a cooperative nonprofit basis, it regularly engages in whole or in part in the practice of assembling or evaluating consumer credit information or other information on consumers for the purpose of furnishing consumer reports to third parties, and which uses means or facilities of interstate commerce for the purpose of preparing or furnishing consumer reports, specifically including mail and telephone communications.

## FACTUAL ALLEGATIONS

### Lead Express Obtains Credit Report Under False Pretenses

13. On September 23, 2015, Lead Express requested a *Credit Bureau Report* ("**CBR**") from Chex Systems regarding Ms. Barrios. **SEE PLAINTIFF'S EXHIBIT B.**

14. Chex Systems recorded Lead Express' request for Ms. Barrios's CBR as a "hard" inquiry, *i.e.*, an inquiry which becomes part of the consumer's credit report, is included in reports provided to other lenders about the consumer, and which is factored into the consumer's credit score.

15. Ms. Barrios became aware of the inquiry on January 26, 2020, after requesting her consumer credit disclosure from FactorTrust, another nationwide CRA; the FactorTrust disclosure contained information supplied to FactorTrust by Chex Systems, which is now part of her FactorTrust file.

16. The information was supplied to FactorTrust by Chex Systems on June 28, 2016.

17. The FactorTrust disclosure revealed Lead Express' September 2015 credit inquiry.

18. Pursuant to the FCRA, 15 U.S.C. § 1681b(f), any person requesting a CBR must have a *permissible purpose* for obtaining it.

19. Lead Express certified to Chex Systems that it was the end user of the report, *i.e.*, it had a permissible purpose to obtain the report because Ms. Barrios had initiated a request for credit or some other business transaction directly with Lead Express.

20. However, Ms. Barrios did not apply for a loan or to transact business with Lead Express, nor did she consent to a credit report being obtained regarding her by Lead Express or any related entity.

21. Indeed, Lead Express could *not* have had any permissible purpose to obtain Ms. Barrios' credit report since Lead Express does not provide consumer lending, according to Chan Joo Chung, general manager of Naito Corp., the parent company of Lead Express, who stated that Lead Express "does not make loans to consumers," "does not service any loans made to consumers," and "does not engage in any underwriting nor does it evaluate any consumer to determine whether a consumer will be offered a loan."
**SEE PLAINTIFF'S EXHIBIT C.**

22. Upon information and belief, Lead Express obtained Ms. Barrios' CBR for marketing purposes, to see if she would qualify for a loan from two online payday

lenders, Gentle Breeze and Harvest Moon, purportedly owned by La Posta Tribal Lending Enterprise in Boulevard, California.

23. Gentle Breeze makes loans to consumers at stratospheric interest rates – **1130.89%** annually. **SEE PLAINTIFF'S EXHIBIT D.**

24. Worse, Gentle Breeze deceptively markets its loans to consumers, creating the false impression that a $200 loan will result in interest and fees of only $92.95, for a total repayment of $292.95. However, for this to be accurate, the consumer must repay the *loan with interest* - $292.95 - within 14 days. To prevent this, Gentle Breeze sets up automatic payment terms to debit only the $92.95 from a consumer's checking account and then "rolls over" the loan for another two weeks, charging another $92.95 in interest and fees. Meanwhile, the consumer is under the belief that the $92.95 is a payment against interest and principal.

25. Interest rates of 1130.89% are illegal in many states, including Florida.

26. Section 687.071, Florida Statutes, renders loans made with annual interest rates greater than 45% a **felony**.

27. Section 687.071(7), Florida Statutes, also states: "No extension of credit made in violation of any of the provisions of this section shall be an enforceable debt in the courts of this state."

28. Any person who willfully makes such a loan, in addition to criminal sanctions, forfeits the right to collect payment for the loan, as such loans are "void as against the public policy of the state as established by its Legislature." *Richter Jewelry Co. v. Schweinert*, 169 So. 750, 758-59 (Fla. 1935).

29. Florida's usury statutes, like those of other states, are designed to "protect against the oppression of debtors through excessive rates of interest charged by lenders." *Sheehy v. Franchise Tax Bd.*, 84 Cal.App.4th 280, 283, 100 Cal. Rptr. 2d 760 (2000).

30. Payday loans made by Gentle Breeze and Harvest Moon are thus **illegal and unenforceable** in the State of Florida.

### Gentle Breeze and Harvest Moon Are Not Tribally Owned

31. The La Posta Band of Mission Indians (the "**Tribe**") is a small, isolated, financially-strapped Indian tribe located approximately 50 miles east of San Diego.

32. The Tribe is purportedly the operator of the online lending businesses of Gentle Breeze and Harvest Moon.

33. However, Gentle Breeze and Harvest Moon are actually owned by non-Tribal members who have engaged in what is commonly referred to as a "Rent-A-Tribe" scheme.

34. In such a scheme, non-tribal payday lenders attempt to circumvent state and federal laws which would otherwise prohibit usurious loans from being issued. They do this by issuing loans in the name of a Native American tribal business entity or entities that purport to be shielded from state and federal law via tribal sovereign immunity. In reality, the tribal lending entity is a "front" for an illegal lending scheme; all substantive aspects of the payday lending operation – funding, marketing, loan origination, underwriting, loan servicing, electronic funds transfers, and collections – are performed by individuals and entities that are unaffiliated with the Native American tribe. In exchange for "renting" its sovereign immunity to the individuals and entities running the

payday lending scheme, the cooperating Native American tribe receives an insignificant fraction of the revenues generated.

35. These so-called "tribal lenders" often do not survive scrutiny when examined closely, as the operations of the lender are conducted off tribal land, by non-tribal members, and predominantly benefit non-tribal members to such a degree that tribal involvement is effectively nil.

36. As the result of the Lead Express inquiry, Ms. Barrios received marketing pitches from Gentle Breeze and other online payday lenders.

37. Not only did Lead Express not have any permissible purpose to obtain a Chex Systems CBR on Ms. Barrios, it obtained the report for nefarious purposes – to sell Ms. Barrios' information to online loan sharks who, through deceptive marketing and advertising pitches, attempted to persuade Ms. Barrios that she should accept a loan with an effective annual interest rate in excess of 1000%.

38. Ms. Barrios must now contend with the fact that her private, personal credit information is in the hands of known loan sharks.

39. Congress defined the invasion of one's privacy as an injury-in-fact, and courts traditionally have recognized statutory violations rooted in privacy invasions as a basis for suit. *See, e.g., Thomas v. FTS USA, LLC*, 193 F. Supp. 3d. 623, 637 (E.D. Va. 2016) (finding that plaintiff asserted standing under §§ 1681b(b)(2) and 1681b(b)(3)); *see also Gambles v. Sterling Infosystems. Inc*., No. 15 CIV. 9746, 2017 WL.

**Chex Systems' Failure to Verify the Identity of Lead Express**

40.    Chex Systems reports typically include phone numbers, employment information, addresses, detailed record of credit inquiries, driver's license number, checking account history, check writing history, and other highly personal, sensitive information.

41.    Pursuant to the FCRA, 15 U.S.C. § 1681e(a), a CRA is required to make a reasonable effort to verify the identity of a new prospective user and verify that such user has a *legitimate* business need for the information.

42.    The FCRA does not define the phrases "reasonable efforts" or "reasonable procedures," but the FTC interprets them to require an agency "to verify that [each user] is . . . a legitimate business having a 'permissible purpose' for the information reported." *Commentary on the Fair Credit Reporting Act*, § 607(b)(2)(A), 55 Fed. Reg. 18,804-01 at 18,819 (May 4, 1990), quoted by *Aleksic v. Clarity Servs., Inc.*, Case No: 1:13-cv-07802 (N.D. Ill. Jul. 8, 2015).

43.    Further, a reasonable effort is "what a reasonably prudent person would do under the circumstances." *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47, 51 (D.C. Cir. 1984).

44.    For multiple reasons, Chex Systems failed to make any reasonable effort to verify the identity of Lead Express or that Lead Express had a legitimate permissible purpose for obtaining reports on consumers, particularly in light of the fact that its name telegraphs its business purpose of obtaining marketing leads for other entities.

45.    By its own admission, Lead Express is not the end user of credit reports.

46. Chex Systems could not have reasonably verified that Lead Express was a legitimate business which would have a permissible purpose to have access to the millions of consumer credit reports contained in Chex Systems' files.

47. It would be inherently unreasonable to believe that an entity whose name indicates that it is in the lead generation business and which freely admits it does not engage in any kind of consumer lending or underwriting had any permissible purpose to obtain credit reports; lead generation for resale to third parties is not a permissible purpose to obtain credit reports under the FCRA.

48. When Chex Systems furnished a CBR regarding Ms. Barrios to Lead Express in September 2015, it had no basis to form a reasonable belief that Lead Express had a permissible purpose for obtaining it.

**Chex Systems Sold Reports With Erroneous Inquiry Information**

49. Chex Systems also recorded Lead Express' inquiry as a "hard" inquiry and included it in reports it sold to third parties, including FactorTrust, who then resold this data to dozens of other lenders.

50. Each and every person obtaining Ms. Barrios' FactorTrust or Chex Systems report would be led to believe that she had applied for a loan with Lead Express when she had not.

51. The inclusion of non-consumer-initiated, promotional inquiries is evidence that Chex Systems failed to follow reasonable procedures to assure the maximum possible accuracy of the reports it sold, since it could only include a record of inquiries which were the result of action **initiated by Ms. Barrios**.

52. Records maintained by Chex Systems show that it sold reports to at least four other entities containing the bogus Lead Express "hard" inquiry, as well as at least one report sold to FactorTrust.

53. Similar to the Lead Express inquiry, Ms. Barrios did not learn that other reports were sold regarding her until she reviewed her FactorTrust disclosure in January 2020.

**Chex Systems Sold Report To FactorTrust Without Permissible Purpose**

54. Chex Systems also sold detailed information to FactorTrust on June 28, 2016, which Ms. Barrios discovered in January 2020.

55. The data included her current and previous addresses, hundreds of data points about her checking account history, a number of payday loan inquiries, driver's license information, and more.

56. Chex Systems had no reasonable basis to believe that FactorTrust intended to use the information about Ms. Barrios in connection with any credit transaction regarding FactorTrust, since FactorTrust is a CRA and not a consumer lender, insurance underwriter, or any type of entity which would normally have a permissible purpose.

57. Chex Systems had no reason to believe any permissible purpose existed for FactorTrust to obtain Ms. Barrios' CBR, since nothing in the FCRA inherently allows one CRA to provide reports to another CRA, absent permissible purpose accorded to that CRA.

**Lead Express Subject To Jurisdiction of Florida Court**

58. Lead Express was aware that it was requesting the report from a CRA that has primary business offices in Jacksonville, Florida.

59. Lead Express was aware that it was requesting a report on a specific individual, Ms. Barrios, who resides in Florida.

60. Simultaneous to this, Lead Express was also conducting extensive business activities with Clarity Services, Inc. ("**Clarity**"), a Clearwater, Florida-based CRA that specializes in providing reports to the online payday lending industry.

61. In a sworn 2015 statement, Naito stated, "I have direct dealings with Clarity in connection with Lead Express' use of Clarity's services." *Turnage v. Clarity Servs., Inc.*, Case No. 3:14-cv-760 (HEH/RCY) (E.D. Va.) (Doc. 75-7, Decl. of Takehisa Naito ¶ 3, July 24, 2015).

62. Indeed, Lead Express had ongoing business transactions with Clarity for years, purchasing over one million consumer reports from them; *see Felix Gillison, Jr., vs. Lead Express, Inc.,* et al, Civil Action No. 3:16cv41, E.D. Virginia. 2017.

63. On information and belief, Lead Express's business activities are directed towards the generation of leads for Gentle Breeze, Harvest Moon, and, likely, other online payday lenders; its two sources of raw materials for these leads, Chex Systems and Clarity, both have their principal place of business within the geographical boundaries of the Middle District of Florida.

64. Thus, at all times relevant, Lead Express was conducting extensive business activities in the State of Florida, with its two main data sources both being within the State.

65. The conduct complained of by Ms. Barrios – the procurement of her credit report containing detailed, sensitive personal information – was done within Florida.

66. Naito is operating as the controlled agent of Lead Express, who used the information obtained from Chex Systems to find leads for his internet payday lending companies, or those of other companies who paid him to do so.

67. All of the monies obtained from this fraudulent scheme are ultimately returned to Naito or his other related companies.

68. At all times relevant, Lead Express did not maintain adequate corporate records or comply with corporate formalities, nor did it generate any separate business or income outside of the procurement of credit reports for lead generation purposes.

69. Further, Naito was aware that the entity to which his company was reselling Ms. Barrios' ill-gotten information was itself not a legitimate "tribally owned" company and was really a Rent-A-Tribe operation.

70. Ms. Barrios has hired the aforementioned law firm to represent her in this matter and has assigned her right to fees and costs to such firm.

## COUNT I
## <u>VIOLATIONS OF THE FCRA – *Lead Express and Naito only*</u>

71. Ms. Barrios incorporates Paragraphs 1 – 70 as if fully restated herein.

72. Lead Express and Naito violated **15 U.S.C. § 1681b(f)** when, pursuant to policies put in place by Naito, and under his direct control, Lead Express and Naito knowingly obtained a CBR from Chex Systems without any permissible purpose by requesting and obtaining a CBR from Chex Systems in connection with an alleged *credit transaction* between Ms. Barrios and Lead Express, when Ms. Barrios had no business or loan with Lead Express, nor could she possibly have had any such loan or account, since Lead Express does not make loans to consumers, and Ms. Barrios never applied for or requested any credit or engaged in any other business transaction with Lead Express.

73. Assuming, *arguendo,* that Ms. Barrios had applied for a loan with Gentle Breeze, Harvest Moon, or similar, such loan would have been *void ab initio* due to Florida's usury laws, and Lead Express still would not have permissible purpose to obtain a CBR; beyond this, Lead Express would have been acting as a reseller of credit reports and would have been required to inform Chex Systems of the full name of the end user of the report, pursuant to 15 U.S.C. §§ 1681e(e)(1)(A) and 1681e(e)(2)(A)(i).

74. Assuming, *arguendo,* that Ms. Barrios had applied for a loan with Gentle Breeze, Harvest Moon, or similar, Lead Express would still have violated 15 U.S.C. § 1681b(f) as this section prohibits obtaining a consumer report for any purpose unless it is obtained for a purpose for which the report is authorized and the purpose has been certified by the prospective user, since it was not obtaining the information for its own purpose but instead obtaining information for the purpose of reselling it to a third party.

75. Lead Express and Naito are thus jointly and severally liable for the above-stated violations.

76. As a result of their conduct, Lead Express and Naito are liable to Ms. Barrios pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. Barrios respectfully requests this Honorable Court to enter judgment against Lead Express and Naito, jointly and severally, for:

a. The greater of statutory damages of **$1,000.00** per incident pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. Barrios' actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

b. Punitive damages for intentional violation of the Act, pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. § 1681o(a)(1);

c. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

d. Such other relief that this Court deems just and proper.

## COUNT II
## VIOLATIONS OF THE FCRA – *Chex Systems only*

77.     Ms. Barrios incorporates Paragraphs 1 – 70 as if fully restated herein.

78.     Chex Systems violated **15 U.S.C. §1681e(a)** when it failed to "make a reasonable effort to verify the identity of a new prospective user and the uses certified by such prospective user prior to furnishing such user a consumer report" by accepting, without challenge or independent verification, that Lead Express intended to use reports for its own purposes, even though, by its own admission, it engages in no consumer lending or insurance underwriting.

79.     Chex Systems violated **15 U.S.C. § 1681b(a)** when it provided reports to Lead Express and Naito while having no reason to believe that Lead Express and Naito had a legitimate business need for the report or intended to use it in connection with any review of account related to Ms. Barrios, or to make any firm offer of credit or insurance; no objective, reasonable basis exists to conclude that an entity which indicates it is in the business of lead generation and which has produced sworn statements indicating it is not in the business of consumer lending or underwriting would only use the report provided by Chex Systems for the purposes certified and no other.

80.     Chex Systems violated **15 U.S.C. § 1681b(a)** when it provided reports to FactorTrust while having no reason to believe that FactorTrust had a legitimate business need for the report or intended to use it in connection with any review of account related to Ms. Barrios, or to make any firm offer of credit or insurance; and no objective, reasonable basis exists to conclude that another CRA would only use the report provided by Chex Systems for the purposes certified and no other.

81. Chex Systems violated **15 U.S.C. § 1681e(b)** when it failed to follow reasonable procedures to assure the maximum possible accuracy of its reports by including promotional or "soft" inquires, *e.g.,* ones not initiated by Ms. Barrios, in reports sold to third parties, including at least four other lenders directly and to FactorTrust, for a total of at least five reports.

82. Chex Systems' conduct was willful and intentional, or alternately, was done with a reckless disregard for its duties under the FCRA.

83. As a result of its conduct, Chex Systems is liable to Ms. Barrios pursuant to the FCRA for statutory damages of up to $1,000 for *each occurrence*, and other relief.

**WHEREFORE,** Ms. Barrios respectfully requests this Honorable Court enter judgment against Chex Systems for:

a. The greater of statutory damages of **$1,000.00** per incident (for a total of $7,000) pursuant to 15 U.S.C. § 1681n(a)(1)(A) or Ms. Barrios' actual damages for economic and non-economic injuries pursuant to 15 U.S.C. § 1681n(a)(1)(A) or 15 U.S.C. §1681o(a)(1);

b. Reasonable costs and attorneys' fees pursuant to 15 U.S.C. §1681n(a)(3) and/or 15 U.S.C. §1681o(a)(2); and,

c. Such other relief that this Court deems just and proper

## DEMAND FOR JURY TRIAL

Ms. Barrios hereby demands a jury trial on all issues so triable.

Respectfully submitted on February 25, 2020, by:

                                 **SERAPH LEGAL, P. A.**
                                 /s/ *Brandon D. Morgan*
                                 Brandon D. Morgan, Esq.
                                 Florida Bar No.: 1015954
                                 bmorgan@seraphlegal.com
                                 /s/ *Thomas M. Bonan*
                                 Thomas M. Bonan, Esq.
                                 Florida Bar No.: 118103
                                 tbonan@seraphlegal.com
                                 2002 E. 5th Avenue, Suite 104
                                 Tampa, FL 33605
                                 Tel: 813-567-1230
                                 Fax: 855-500-0705
                                 *Attorneys for Plaintiff*

**ATTACHED EXHIBIT LIST**
A	Declaration of Takehisa Naito, May 23, 2016
B	Ms. Barrios' FactorTrust Consumer Disclosure, January 26, 2020, Excerpt
C	Declaration of Chan Joo Chung, April 7, 2016
D	Sample Loan Agreement from Gentle Breeze